The Honorable Marsha J. Pechman

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

SEATTLE AUDUBON SOCIETY, *et al.*

                     Plaintiffs,

    v.

DOUG SUTHERLAND, *et al.*,

                     Defendants.

NO.  C06-1608 MJP

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE:  JURISDICTIONAL ISSUES AND MEMORANUDM IN SUPPORT THEREOF**

**NOTE ON MOTION CALENDER:  MARCH 15, 2007**

## MOTION

    State Defendants by and through their attorneys of record, ROBERT M. MCKENNA, Attorney General; PATRICIA HICKEY O'BRIEN and JON P. FERGUSON, Senior Assistant Attorneys General; and NEIL L. WISE and SHEILA D. LYNCH, Assistant Attorneys General, submit the following motion for summary judgment pursuant to Fed. R. Civ. P. 56 and memorandum in support thereof.

## MEMORANDUM

### I.    INTRODUCTION

    The Seattle and Kittitas chapters of the Audubon Society (Audubon) have filed a citizen's suit under the Endangered Species Act (ESA), alleging that the State Defendants are

STATE DEFS' MOTION FOR SJ RE:
JURISDICTIONAL ISSUES AND
MEMORANDUM IN SUPPORT
THEREOF  (NO. C06-1608 MJP)

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(360) 753-6200

1  required to administer the ESA and enforce federal standards against private citizens.[1]

2  Based on this flawed legal theory, Audubon asks this Court to ban forest practices on

3  approximately 47,000 acres of private forest land, even activities authorized under state law.

4  State Defendants' Answer, ¶ 56. Audubon claims that this drastic action is necessary to save

5  the Northern Spotted Owl, even though the land affected constitutes only a small portion of

6  the potential owl habitat in Washington.[2]

7  　　　Specifically, Audubon requests the following relief relevant to this motion:

8  (1) a court declaration that DNR and its officials are harming and harassing spotted owls in

9  violation of ESA § 9 by approving forest practice applications that authorize forest practices

10  in certain owl territories; (2) a court declaration that forest practice regulations adopted by

11  the Board and its members are invalid and preempted by federal law, to the extent these

12  regulations allow the harm and harassment of spotted owls in violation of ESA § 9;  and

13  (3) an injunction preventing DNR and its officials from approving forest practices that

14  adversely affect suitable spotted owl habitat in certain owl territories until the State provides

15  reasonable assurances that State-authorized forest practices will not "take" spotted owls in

16  violation of the ESA.  Audubon Complaint, Prayer for Relief, ¶ ¶ A, B, D. *See also* First and

17  Second Claims for Relief, Complaint, ¶ ¶ 79-84.

18  　　　As a matter of law, DNR and the Board (as state agencies) and the Board's members

19  (in their legislative capacity) are immune from this type of civil suit in federal court; this

20  Court lacks jurisdiction over the State Defendants because they have not committed any ESA

21  violation; the tenth amendment to the United States Constitution bars the relief requested

22  against State Defendants; the facial challenge to the Board's regulations is not ripe for

23

24  [1] The State Defendants are the Washington Department of Natural Resources (DNR), named DNR officials, the Forest Practices Board (Board), and the individual Board members.

25  [2] The complaint only implicates the regulatory activities of DNR.  In addition to regulating forest practices, DNR also manages state land.  DNR's land management activities are not at issue in this case.  The State has an Incidental Take Permit and Habitat Conservation Plan covering forest management activities on the

26  1.6 million acres of forested state land within the range of the owl.  Declaration of Young (Young Declaration), ¶ 4.

STATE DEFS' MOTION FOR SJ RE:
JURISDICTIONAL ISSUES AND
MEMORANDUM IN SUPPORT
THEREOF (NO. C06-1608 MJP)

2

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
(360) 753-6200

review; Audubon lacks standing to bring the First and Second Claims for Relief; and according to the *Burford* abstention doctrine,[3] this Court should decline to review the First and Second Claims for Relief. There are no genuine issues of material fact related to the above legal issues, and this Court should grant the State Defendants' motion for summary judgment.

## II.   BACKGROUND

### A.   Northern Spotted Owl in Washington.

The Washington Fish and Wildlife Commission listed the Northern Spotted Owl (*Strix occidentalis caurina*) as "endangered" under state law in 1988, and the U.S. Fish and Wildlife Service (USFWS) listed the owl as "threatened" in 1990. Young Declaration, ¶ 7. In 2004, the USFWS conducted a five-year status review on the spotted owl and recommended that the species not be upgraded to endangered status. The review indicated that the spotted owl population continues its overall decline and that the decline may be greater in Washington than in Oregon or California. The five-year review identified the effects of past and current timber harvest, loss of habitat to fire, and Barred Owls as major threats to the spotted owl. *Id.* ¶ 8.

In March 2006, USFWS announced its intent to develop a recovery plan for the spotted owl. USFWS convened a recovery team in May 2006 and indicated that it planned to issue a draft recovery plan in November 2006 and a final plan in November 2007. The State is represented on the recovery team and is actively working with USFWS to ensure a comprehensive, coordinated state-federal approach. Although the USFWS has not yet issued its draft recovery plan, work is continuing, and USFWS still intends to produce a final recovery plan by November 2007. *Id.* ¶¶ 9, 17.

### B.   Forest Practices Act.

State regulation of forest practices is governed primarily by the Forest Practices Act (Act), Wash. Rev. Code 76.09 (2006). The main purposes of the Act are to protect

---

[3] *Burford v. Sun Oil Co., et al.*, 319 U.S. 315 (1943).

STATE DEFS' MOTION FOR SJ RE:
JURISDICTIONAL ISSUES AND
MEMORANDUM IN SUPPORT
THEREOF (NO. C06-1608 MJP)

3

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   public resources[4] and maintain a viable forest products industry. Wash. Rev.

2   Code § § 76.09.010(1), .370(2). The Act is implemented mainly by three separate state

3   agencies: the Board, DNR, and the Forest Practices Appeals Board (FPAB).[5]

4       The Board[6] adopts forest practice regulations to implement the Act in accordance with

5   the purposes and policies set forth by the state Legislature. Wash. Rev. Code § § 76.09.040(1),

6   .370(2). DNR enforces the requirements of the Act through stop work orders, notices to

7   comply, notices of intent to disapprove applications, civil penalties, and recommendations for

8   criminal prosecutions. Wash. Rev. Code § § 76.09.080, .090, .140, .170, .190. DNR also

9   reviews, approves, and conditions forest practices applications. The FPAB is a quasi-judicial

10  state agency with members appointed by the Governor. Wash. Rev. Code § 76.09.210. In

11  most circumstances, the FPAB has jurisdiction to hear appeals of DNR forest practices

12  "actions or determinations." Wash. Rev. Code § 76.09.220(7).

13      As directed by the state Legislature, the Board has determined which particular forest

14  practices are included in each of four classes. The classification is dependent upon the impact

15  the forest practice has on elements of the environment, ranging from Class I, which has no

16  direct potential for damaging a public resource, to Class IV, which has a potential for

17  substantial impact on the environment and requires State Environmental Policy Act (SEPA)

18  review. Wash. Rev. Code § 76.09.050(1); Wash. Admin. Code § 222-16-050 (2006 Supp.).

19  To conduct Class I forest practices, a landowner or operator is not required to notify DNR or

20  obtain any approval. For Class II forest practices, the landowner or operator is required to

21

---

22  [4] A "public resource" is defined as water, fish, wildlife or capital improvements of the State or its
    political subdivisions. Wash. Rev. Code § 76.09.020(19); Wash. Admin. Code § 222-16-010 (2006 Supp.).
23  [5] The Act also allows local governments to take over the regulation of forest practices that converts lands
    to nonforest use. Several counties in Washington have exercised this option. Wash. Rev. Code § 76.09.240.
24  [6] The Board is composed of 12 members, including the Commissioner of Public Lands; the Director of
    the Department of Community, Trade, and Economic Development; the Director of the Department of
25  Agriculture; the Director of the Department of Ecology (Ecology); the Director of the Department of Fish and
    Wildlife (WDFW); an elected member of a county legislative authority appointed by the Governor; and six
26  members of the general public appointed by the Governor (one of whom must be an owner of 500 acres or less of
    forest land and another an independent logging contractor). Wash. Rev. Code § 76.09.030(1).

STATE DEFS' MOTION FOR SJ RE:
JURISDICTIONAL ISSUES AND
MEMORANDUM IN SUPPORT
THEREOF (NO. C06-1608 MJP)

4

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    notify DNR, but DNR does not approve the activity.  With Class III and IV forest practices, the

2    landowner or operator is required to submit an application and obtain DNR approval.  Wash.

3    Rev. Code § 76.09.050(2).  Young Declaration, ¶ 5.

4         The Act prescribes timelines for DNR decision making.  DNR has 30 days to act on a

5    Class III application.  Wash. Rev. Code § 76.09.050(1); Wash. Admin. Code § 222-20-020(1).

6    DNR also has 30 days for Class IV forest practices unless an Environmental Impact Statement

7    is required under SEPA, in which case the processing time is normally 60 days.  Wash. Rev.

8    Code § 76.09.050(1); Wash. Admin. Code § 222-20-020(1).  If DNR fails to approve or

9    disapprove the applications within the statutory deadlines, the applications are deemed

10    automatically approved.  Wash. Rev. Code § 76.09.050(5); Wash. Admin. Code § 222-20-

11    020(4).

12    **C.**    **State Protection for the Spotted Owl.**

13         The Board adopted the current version of its rules pertaining to the spotted owl in 1996.

14    The Board's strategy in adopting these rules was to complement northern spotted owl

15    conservation efforts on federal land, as described in the Northwest Forest Plan (NWFP).  Under

16    the NWFP, the federal government has created a system of "late successional reserves" that

17    contain large amounts of spotted owl habitat, and has reduced timber harvest on federal lands

18    covered by the Plan.  The majority of spotted owl habitat in Washington State is located on

19    federal land.  Two of the Board's rule objectives were to:  (1) Define a level of [owl

20    conservation] contribution from nonfederal lands that is essential to complement the federal

21    recovery and conservation strategy for the northern spotted owl in Washington State, and

22    (2) Identify those landscapes that are essential to complement the federal conservation and

23    recovery strategy and whether their primary function is for dispersal or population

24    maintenance.  To assist it in its rule-making process, the Board convened a group of scientists to

25    provide scientific information and recommendations in relation to the rulemaking.  This group

26    was referred to as the Spotted Owl Scientific Advisory Group (SOSAG).  Many, but not all, of

STATE DEFS' MOTION FOR SJ RE:         5         ATTORNEY GENERAL OF WASHINGTON
JURISDICTIONAL ISSUES AND                   1125 Washington Street SE
MEMORANDUM IN SUPPORT                   PO Box 40100
THEREOF (NO. C06-1608 MJP)                 Olympia, WA  98504-0100
                                    (360) 753-6200

1   SOSAG's recommendations were incorporated into the rules the Board adopted.  The Board also

2   considered a rule proposed by USFWS under section 4(d) of the ESA; however, this rule was

3   never adopted by USFWS.  Before the current rules were adopted, a series of DNR policy memos

4   (1990-1992) and then forest practices rules (1992-1996) required and guided SEPA review for

5   applications involving timber harvest at sites known to be occupied by resident spotted owls.

6   Young Declaration, ¶ 10.

7        To supplement the federal reserves, the Board created ten "Spotted Owl Special

8   Emphasis Areas" (SOSEAs), based in part on the recommendations of SOSAG.  *See* Wash.

9   Admin. Code § § 222-16-010 (definition of SOSEA goals), 222-16-086.  These areas were

10  identified as having the greatest value in complementing the federal recovery strategy, due to

11  their proximity to federal owl habitat and importance as dispersal corridors.  The Board did not

12  designate SOSEAs in Southwest Washington or the North Olympic Peninsula because the Board

13  believed that its rule objectives could be achieved without designating SOSEAs in these areas.

14  There are almost no federal lands in Southwest Washington, and the Board believed "the dispersal

15  function could be adequately achieved through normal forest management practices."  Young

16  Declaration, ¶ 12.

17        The forest practices rules include triggers for environmental review under SEPA and

18  guidelines for conditioning approvals or denying applications.  Wash. Admin. Code § § 222-

19  16-080, 222-10.    SEPA review and harvest restrictions are focused on administrative spotted

20  owl "circles" based on median home ranges.   Wash. Admin. Code § § 222-16-080(1)(h),

21  10-040, 10-041.  Inside SOSEAs, most forest practices in owl territories trigger further review.

22  Wash. Admin. Code § 222-16-080(1)(h)(i).  Outside SOSEAs, core habitat around a site center

23  is protected during the breeding season.   Wash. Admin. Code § § 222-16-080(1)(h)(iii),

24  222-10-041(5).  The rules also define the characteristics of spotted owl suitable habitat.  Wash.

25  Admin. Code § 222-16-085.  Young Declaration, ¶ ¶ 12, 13.

26  .

1    State forest practices rules were never intended to implement or enforce the ESA.

2    These rules provide that the "[ESA] and other federal laws may impose certain obligations on

3    persons conducting forest practices. **Compliance with the Forest Practices Act or these**

4    **rules does not ensure compliance with the Endangered Species Act** or other federal laws."

5    Wash. Admin. Code § 222-50-020(5) (emphasis added). This disclaimer, which clarifies that

6    forest practice approvals do not purport to authorize ESA violations, is also stated on forest

7    practices applications and approvals. Young Declaration, ¶ 14.

### III.   ARGUMENT

9    **A.    Summary Judgment Standards.**

10    The Court may grant summary judgment "if the pleadings, depositions, answers to

11    interrogatories, and admissions on file, together with affidavits, if any, show that there is no

12    genuine issue of material fact and the moving party is entitled to judgment as a matter of law."

13    Fed. R. Civ. P. 56(c). Regarding the legal issues raised in the State Defendants' summary

14    judgment motion, there are no genuine issues of material fact for trial, and the State

15    Defendants are entitled to judgment as a matter of law.

16    **B.    Audubon's Claims Against the State Agencies and Board Members are Barred by**
      **State Sovereign Immunity.**
17

18    The eleventh amendment to the United States Constitution generally prohibits federal

19    courts from entertaining actions by private citizens against state governments, including state

20    agencies. *Natural Resources Defense Council v. Cal. Dep't of Transp.,* 96 F.3d 420, 421

21    (9th Cir. 1996). This general rule prevails unless Congress has abrogated state immunity under

22    a particular statute or the state has consented to suit in federal court.

23    Congress has not abrogated state sovereign immunity under the ESA. Any abrogation

24    of state sovereign immunity by Congress must be clear and unequivocal, *Dellmuth v. Muth,*

25    491 U.S. 223, 228 (1989), and general authorization for suit in federal court is not an

26    unequivocal abrogation. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 246 (1985).

1    In the ESA, Congress recognized the states' Eleventh Amendment immunity and addressed it

2    in the law's citizen suit provision. 16 U.S.C. § 1540(g)(1)(A). The ESA provides that a person

3    may commence a civil suit to enjoin state agencies only "to the extent permitted by the

4    eleventh amendment to the Constitution." *Id.* After analyzing identical language in the Clean

5    Water Act, the Second Circuit concluded:

6           These provisions do not unequivocally express Congress's intent to abrogate
            sovereign immunity and subject states to suit. Far from evidencing a
7           Congressional intent to do away with sovereign immunity, these provisions
            are expressly limited by the Eleventh Amendment. [citations omitted] The
8           district court was, therefore, correct in holding that these citizen suit
            provisions do not abrogate Connecticut's sovereign immunity and that the
9           state defendants are therefore entitled to immunity from suit in federal court.

10   *Burnette v. Carothers,* 192 F.3d 52, 57 (2nd Cir. 1999).

11          The ESA was adopted pursuant to the Commerce Clause. *See Nat'l Ass'n of Home*

12   *Builders v. Babbitt,* 130 F.3d 1041 (D.C. Cir. 1997). Congress may only abrogate state

13   immunity through Section 5 of the Fourteenth Amendment and not under the Commerce

14   Clause. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 59, 66 (1996).

15          The State of Washington has not waived its sovereign immunity under the ESA or

16   consented to suits under this statute. Although a state may waive its sovereign immunity by

17   consenting to suit in federal court, such waiver must be unequivocally expressed. *Pennhurst*

18   *State School & Hospital v. Halderman,* 465 U.S. 89, 99 (1984). Washington's waiver of

19   immunity in its own courts does not waive its immunity in federal court. *McConnell v.*

20   *Critchlow,* 661 F.2d 116, 117 (9th Cir. 1981). Also, State receipt of funds through a federal

21   program is not sufficient to establish consent to be sued in the federal courts. *Edelman v.*

22   *Jordan,* 415 U.S. 651, 673 (1974).

23          State immunity extends to state agencies that act on behalf of the state and can

24   therefore assert the state's sovereign immunity. *Natural Resources Defense Council v. Cal.*

25   *Dep't of Transp.,* 96 F.3d 420, 421 (9th Cir. 1996); *Pennhurst State School & Hospital v.*

26   *Halderman,* 465 U.S. 89, 100 (1984); *National Audubon Society, Inc. v. Davis,* 307 F.3d 835,

847, 854-55 (9th Cir. 2002). Because DNR and the Board are state agencies, they are not subject to suits for injunctive relief brought in federal court. *See* Wash. Rev. Code § § 43.30.030 (DNR); 76.09.030(1) (Board). These two agencies should be dismissed from this case.

Under federal common law, the Board members are immune from Audubon's lawsuit. "It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities." *Bogan v. Scott-Harris,* 523 U.S. 44, 46 (1998). To determine who is eligible for this immunity, courts use a functional equivalency test. *Id.* at 53. In other words, any government official that engages in legislative activity is entitled to this protection. The immunity extends to legislative-type rules. *Alexander v. Holden,* 66 F.3d 62, 67 (4th Cir. 1995). "The purpose of this immunity is to insure that the legislative function may be performed independently without fear of outside interference" and to protect legislators "not only from the consequences of litigation's result but also from the burden of defending themselves." *Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 731-32 (1980). The U.S. Supreme Court has clarified that this immunity applies regardless of whether the relief requested is monetary damages or prospective injunctive relief. *Id.* at 732-33.

Forest practices rulemaking is the Board's primary function, and as a rule-making body, the Board operates in a legislative capacity. Wash. Rev. Code § 76.09.040. Therefore, the Board members are the functional equivalent of legislators and immune from suit. The reasons for the immunity stated above apply equally to the Board members. The Board members should be dismissed from this lawsuit.

**C.**   **There Has Been No ESA Violation That Would Give the Court Jurisdiction Over the State Defendants.**

The citizen's suit provision of the ESA states that any person may commence a civil suit to enjoin any person alleged to be in violation of the ESA. 16 U.S.C. § 1540(g)(1)(A).

STATE DEFS' MOTION FOR SJ RE:
JURISDICTIONAL ISSUES AND
MEMORANDUM IN SUPPORT
THEREOF  (NO. C06-1608 MJP)

9

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    However, if the court determines as a matter of law that a defendant's actions are not a

2    violation of the ESA, it follows that the court would lack jurisdiction to proceed against that

3    defendant and would dismiss them from the case.   The state in its regulatory capacity has no

4    duty to ensure that third-party permittees do not violate the ESA.   Therefore, a failure to force

5    private citizens to meet federal standards for forest practices would not, as a matter of law,

6    constitute an ESA violation.   Since the State Defendants have not committed any violation,

7    they should be dismissed from this case.

8         Furthermore, the text of the ESA argues against its application in a manner that requires

9    states to enforce its restrictions.   The plain language of the ESA makes it very clear that

10   Congress intended the statute to be administered and enforced primarily by the federal

11   government and not the states.   State participation in the federal program is voluntary and

12   cannot be made mandatory.   The states are to be encouraged, through incentives and financial

13   assistance, to cooperate in the implementation of the ESA.

14        The ESA places numerous responsibilities on the federal agencies.   Congress declared

15   that "all Federal departments and agencies shall seek to conserve endangered species and

16   threatened species and shall utilize their authorities in furtherance of the policies of this

17   chapter." 16 U.S.C. § 1531(c).[7]   Congress also required that each federal agency shall "insure

18   that any action authorized, funded, or carried out by such agency is not likely to jeopardize the

19   continued existence of any endangered species or threatened species or result in the destruction

20   or adverse modification of [critical habitat.]"   *Id.* at 1536(a)(2) (parenthetical omitted).

21   The USFWS and NOAA-Fisheries[8] are in charge of ESA enforcement.   16 U.S.C.

22   § 1540(e)(1). 50 C.F.R. § 402.01(b).[9]

23

24   _____

     [7] 16 U.S.C. § 1536(a)(1) contains the substantive requirement related to this policy.
     [8] This agency is also known as the National Marine Fisheries Service or NMFS.
25   [9] USFWS also has the authority under 16 U.S.C. § 1533(d) to promulgate federal rules for the
     conservation and protection of spotted owls.  Instead of suing the state agencies, Audubon should petition for such
     a rule and make their case for its necessity with USFWS, the expert agency charged with implementing and
26   enforcing the ESA.

1    In contrast, Congress directed that state involvement in the administration and

2    enforcement of the ESA be encouraged but remain entirely voluntary.   The statute provides

3    that "**encouraging** the States and other interested parties, **through Federal financial**

4    **assistance and a system of incentives**, to develop and maintain conservation programs which

5    meet national and international standards is a key to meeting" the purposes of the ESA.

6    *Id.* at 1531(a)(5) (emphasis added).   In a section of the ESA entitled "Cooperation with the

7    States," the Secretaries of Interior and Commerce are required to "cooperate to the maximum

8    extent practicable with the States." *Id.*   at 1535(a).   Such cooperation is to include agreements

9    for management and funding. *Id.* at (c)(1).

10    The federal government "may utilize **by agreement**, . . .   the personnel, services, and

11    facilities of . . . any State agency for purposes of enforcing this Act."   16 U.S.C. § 1540(e)(1)

12    (emphasis added).   Accordingly, if the states are somehow involved in ESA enforcement, that

13    cooperation is to be achieved through agreement with the appropriate federal agencies, rather

14    than ordering the State of Washington to administer and enforce the ESA.   Washington has no

15    agreement under 16 U.S.C. § § 1535 or 1540(e)(1) with the federal government for forest

16    practices.[10]

17    Despite the plain language of the ESA, a First Circuit case allowed an ESA citizen suit

18    against state agencies to proceed and applied arguably unconstitutional remedies.   In *Strahan v.*

19    *Coxe,* 127 F.3d 155 (1st Cir. 1997), plaintiffs sued Massachusetts state officials, alleging that

20    the state's fishing regulations could potentially cause a take of the endangered northern right

21    whale.   Several whales had been entangled in fishing gear, which could injure or kill them.

22    The Court found the state liable for the actions of the regulated fishers and ordered the state to

23

24

---

25    [10] Under state law, the rules do satisfy the requirements of the Clean Water Act.   Wash. Rev. Code
§ 90.48.425 (2006).   The State has also voluntarily developed a Habitat Conservation Plan and received an

26    Incidental Take Permit for the forest practices program for listed fish species.   This agreement does not cover
potential impacts to owls, or other upland species.   Young Declaration, ¶ 4.

form a "working group" and apply for an Incidental Take Permit for taking of the whales. *Strahan,* 127 F.3d at 158-59, 163.[11]

Besides the flaws in reasoning and analysis, *Strahan* is also factually distinguishable from Audubon's challenge.  First, *Strahan* was not a habitat modification case but involved state regulations on fishing that resulted in incidental harm to listed species.  Habitat modification raises causation issues not present with incidental take through fishing.  Second, *Strahan* involved the management of public resources held in trust by the state for the public.  The forest practices rules at issue here impose restrictions on private activities on private land in order to protect public resources.  Third, in *Strahan,* there were documented incidents of past "taking" of whales.  *Id.,* at 158-59.  In Washington, there has been no proven taking of owls as a result of state rules or approvals.

Another case that discussed taking by nonfederal regulatory programs is *Loggerhead Turtle v. County Council of Volusia County, Fla.,* 148 F.3d 1231 (11th Cir. 1998).  In that case, the plaintiffs claimed county ordinances which regulated beachfront lighting were taking endangered sea turtles.  The Eleventh Circuit court overturned a summary judgment ruling at the trial court level and remanded for determination of take liability and causation issues.  *Id.* at 1234.  The appellate court found that the plaintiffs had standing and that, under the right set of facts, the county could be violating the ESA.  *Id.* at 1253, 1258.  On remand, the trial court characterized plaintiff's claim as seeking "to compel the County to adopt an even *more* 'turtle-friendly' ordinance," which was the only remedy that would satisfy their complaint.  *Loggerhead Turtle v. County Council of Volusia County, Fla.,* 92 F. Supp. 2d 1296, 1307 (M.D. Fla. 2000).  In declining to hold that alleged inadequate regulation was a violation, the court summarized the County's obligations under the ESA:

---

[11] *Strahan* ordered relief that the Ninth Circuit has refused to grant.  This circuit has "established that pursuing an ITP is not mandatory and a party can choose whether to proceed with the permitting process." *Defenders of Wildlife v. Bernal,* 204 F.3d 920, 927 (9th Cir. 2000); *Forest Conservation Council v. Rosboro Lumber Co.,* 50 F.3d 781, 783 (9th Cir. 1995).

1    Congress imposed upon federal agencies the responsibility for implementing
     and enforcing the [ESA.]  The [ESA] authorizes the Secretary of the Interior to
2    enter into management and cooperation agreement with the States, whose
     participation in conservation programs the [ESA] encourages.   The [ESA]
3    requires no affirmative conservation action by states or local governments. The
     [ESA] neither compels nor precludes local regulation; it preempts that which is
4    in conflict.  Volusia County cannot be made to assume liability for the act of its
     private citizens merely because it has chosen to adopt regulations to ameliorate
5    sea turtle takings.   Such an anomalous result would frustrate the intent and
     purpose of the [ESA]'s cooperative agreement provisions.   Accordingly, the
6    Court finds that Volusia County has not violated the Endangered Species Act by
     enacting and enforcing its Minimum Standards for Sea Turtle Protection.

7

8    *Id.* at 1308.   The *Volusia County* case is not helpful to Audubon, as the court ultimately

9    decided that allegedly inadequate regulation by a government agency was not an ESA

10   violation.

11       Audubon bases its claim against the State Defendants on the theory of vicarious

12   liability as laid out in the *Strahan* and *Volusia County* appellate cases.   Complaint, ¶¶ 81, 84;

13   Audubon Motion for Preliminary Injunction, pp. 14-17.   As noted in the *Volusia County*

14   district court opinion, this theory contradicts the plain language of the ESA by imposing

15   federal agency obligations on state agencies and is inconsistent with the system of federal-state

16   cooperation envisioned by the ESA.   The theory also has no logical bounds.   In effect, any

17   person involved in any way with an operation that ultimately results in a take of listed species

18   would be violating federal law.   This would include regulatory agencies, contractors, and

19   funding entities.

20       The vicarious liability theory has been discussed and criticized in several law review

21   articles.[12]   Professor Ruhl concludes that if "you are for the ends justifying the means, you will

22

23   ──────────────
     [12] Prof. J.B. Ruhl, *State and Local Government Vicarious Liability under the ESA*, 16 NAT. RESOURCES
     & ENV'T 70 (ABA Fall 2001); Prof. James Rasband, *Priority, Probability, And Proximate Cause:  Lessons From
24   Tort Law About Imposing ESA Responsibility For Wildlife Harm On Water Users And Other Joint Habitat
     Modifiers*, 33 ENVTL. L. 595, 623-28 (2003); Prof. Jonathan Adler, *Judicial Federalism and the Future of Federal
25   Environmental Regulation*, 90 IOWA L. REV. 377, 429-30 (2005); Valerie Brader, *Shell Games: Vicarious Liability
     of State and Local Governments for Insufficiently Protective Regulations under the ESA*, 45 NAT. RESOURCES J.
26   103 (2005); Shannon Petersen, *Endangered Species In The Urban Jungle: How The ESA Will Reshape American
     Cities*, 19 STAN. ENVTL. L. J. 423, 438-54 (2000).

STATE DEFS' MOTION FOR SJ RE:              13          ATTORNEY GENERAL OF WASHINGTON
JURISDICTIONAL ISSUES AND                                     1125 Washington Street SE
MEMORANDUM IN SUPPORT                                            PO Box 40100
                                                            Olympia, WA 98504-0100
THEREOF (NO. C06-1608 MJP)                                       (360) 753-6200

1    find the ESA vicarious liability irresistible; if you believe in the rule of law, you will

2    vigorously oppose vicarious liability." Ruhl, *supra*, at 77. Professor Rasband finds the

3    *Strahan* reasoning "dubious not just as a matter of congressional intent but as a matter of

4    causation." Rasband at 625. Associate Professor Adler notes that "in effect, Strahan holds that

5    states have an obligation to administer state regulatory programs so as to implement the federal

6    ESA, even though the activities to be regulated are themselves already illegal under federal

7    law." Adler at 429. He concludes that *Strahan's* ruling violates the Tenth Amendment. *Id.* at

8    430. Ms. Brader concludes that "vicarious liability jurisprudence is too severely flawed to

9    maintain vitality. The [ESA] and its implementing regulations do not support it, the causation

10   is too tenuous to provide standing, and the federalism jurisprudence forbids it." Brader at 103.

11   Mr. Peterson concludes that "the plain meaning of the ESA, the Supreme Court's interpretation

12   of that meaning, the Act's structure, and the congressional intent behind the ESA do not

13   support the proposition that state and local governments can be liable for the actions of others."

14   Peterson at 439. The Court should carefully consider these commentaries when evaluating

15   Audubon's claims.

16          For the reasons stated above, this Court should refuse to adopt the theory of vicarious

17   liability under the ESA. Instead, the Court should give effect to the plain language of the ESA

18   and decline to force the State Defendants to act contrary to Congress' intent. There has been

19   no violation of the ESA by State Defendants, and the Court should dismiss them from this

20   case.

21   **D.    The Relief Requested by Audubon is Prohibited by the Tenth Amendment to the**
22   **Federal Constitution.**

23          Audubon argues that the State Defendants are liable for take under the ESA because the

24   State is allegedly not regulating the activities of private third parties according to federal

25   standards. In doing so, Audubon in effect asks this Court to construe the ESA as requiring the

26   State to implement and enforce the ESA prohibition against take. Complaint, Prayer for

STATE DEFS' MOTION FOR SJ RE:                    14

1   Relief, ¶ D.  Through this lawsuit, Audubon is attempting to coerce the State into adopting

2   federal standards.

3          This interpretation is precluded by the Tenth Amendment, and a court has a duty to

4   adopt a reasonable ESA construction which avoids the "grave and doubtful constitutional

5   questions" posed by Audubon's theory.  *Jones v. United States*, 526 U.S. 227, 239 (1999).

6   Thus, the Court should decline to adopt Audubon's unconstitutional interpretation of the

7   statute.   Supreme Court case law is clear that Congress may not "commandeer" state

8   governments to implement and enforce federal law.   Such Congressional action is inconsistent

9   with the principles of federalism embodied in the Constitution.  In *New York v. United States*,

10  505 U.S. 144 (1992), the Court ruled that Congress lacked the authority to require a state to

11  regulate the disposal of low-level nuclear waste generated within that state.  The Court stated

12  that Congress lacks the power to compel states to require or prohibit particular acts.  *Id.* at 166.

13          Likewise, in *Printz v. United States*, the Court stated that:

14      The Federal Government may neither issue directives requiring the States to
        address particular problems, nor command the States' officers, or those of their
15      political subdivisions, to administer or enforce a federal regulatory program. . . .
        such commands are fundamentally incompatible with our constitutional system
16      of dual sovereignty.

17  521 U.S. 898, 935 (1997).

18          The Court noted in *New York* that there are means short of coercion that the federal

19  government may use to influence the States' policy choices.  Congress may attach conditions

20  to the receipt of federal funds.   Alternatively, Congress may offer states the choice of

21  regulating an activity consistent with federal law or having state regulations preempted by

22  federal law.  *Id.* at 166-68.  For example, the Clean Water Act offers the States the option of

23  implementing their own federally-approved permitting program or having its citizens regulated

24  directly by the EPA.  33 USC § 1342(b).  However, *requiring* a state to administer and enforce

25  federal policy is unconstitutional.   The "federal government may not force the States to

26  regulate third parties in furtherance of a federal program."  *Environmental Defense Center, Inc.*

1   *v. U.S. Environmental Protection Agency*, 344 F.3d 832, 847 (9th Cir. 2003).   The Tenth

2   Amendment bars any requirement that the State adopt and enforce regulations prohibiting take

3   of the spotted owl.

4       Audubon will likely argue that they do not ask the Court to require the State to

5   *administer* federal law, but merely *comply* with federal law.   This is incorrect and also fails to

6   recognize that Washington is not out of compliance with the ESA.   It is undisputed that the

7   State is prohibited, as is any private citizen, from directly "taking" listed species.   It is also

8   undisputed that, to the extent State law conflicts with federal law, federal law preempts state

9   law.   16 U.S.C. § 1535(f).   *See Florida Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43

10  (1963).   However, the effect of preemption is not to require that the state adopt regulations

11  implementing federal law – instead, the federal ESA simply supersedes any inconsistent state

12  law.   *See United States v. Glenn-Colusia Irrigation Dist.*, 788 F. Supp. 2d 1126, 1134

13  (E.D. Cal. 1992); *Swan View Coalition v. Turner*, 824 F. Supp. 2d 923, 937 (D. Mont. 1992).

14  As explained in Section II. C., the forest practices rules do not authorize forest practices

15  applicants to violate the ESA and, in fact, notify such applicants that they are responsible for

16  complying with the ESA.[13]   Therefore, the requested injunctive relief is more properly

17  characterized as an effort to force the State to include approval conditions that meet not only

18  state regulatory standards, but federal standards as well.   Asking this Court to require the State

19  to force private citizens to meet federal standards goes far beyond mere compliance with the

20  ESA.   It is a contention that the State must implement and enforce the ESA's "take"

21  prohibition.   That requested relief must fail under the principles embodied in the Tenth

22  Amendment.

23  /////

24  /////

25

26  ───────────
    [13] As Professor Ruhl points out, the State Defendants have not caused, approved, or solicited takes because they have expressly and officially withheld authorization of any violations of the ESA. Ruhl, at 75.

1    **E.      Audubon Lacks Standing to Bring Their First and Second Claims for Relief.**

2            As a matter of law, Audubon cannot meet two of the prerequisites for standing to bring

3    their First and Second Claims for Relief.  The leading authority on standing under the ESA is

4    *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992).  In this case, the United States Supreme

5    Court described the test for standing as containing three elements:  first, the plaintiff must have

6    suffered an "injury in fact."  Second, there must be a causal connection between the injury and

7    the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action

8    of the defendant, and not . . . th[e] result [of] the independent action of some third party not

9    before the court."  Third, it must be "likely," as opposed to merely "speculative," that the

10   injury will be "redressed by a favorable decision."  *Lujan,* 504 U.S. at 560-61.

11           Audubon, as the party invoking federal jurisdiction, bears the burden of establishing

12   these elements of standing.  *Lujan,* 504 U.S. at 561.  At the pleading stage, general factual

13   allegations of injury resulting from the State Defendants' conduct may suffice.  *Id.*  However,

14   in response to a summary judgment motion, Audubon can no longer rely on mere allegations,

15   but must set forth specific facts through affidavits or other evidence.  *Id.*  While Audubon may

16   be able to satisfy the injury element of the standing test, they cannot meet the requirements for

17   the causation and redressability elements.

18           Audubon has not shown any direct causal connection between the State Defendants'

19   actions and a threat to the spotted owl.  Causation has to be fairly traceable to the actions of the

20   State Defendants and not the result of the independent action of some third party not before

21   this Court.  A state forester's approval of a forest practices application is not the cause of any

22   harm to owls.  The impact on owls would arise from subsequent forest practices conducted by

23   a third party.  In this case, many of the persons conducting forest practices are independent

24   actors who are not parties before this Court, and the Court cannot directly control their actions

25   or predict their choices with any certainty.  *See Salmon Spawning & Recovery Alliance v.*

26   *Gutierrez,* slip op., WL 2620421 (W.D. Wash. 2006).  It is already illegal under federal law to

1    "take" a spotted owl. As shown by declarations submitted with Washington Forest Protection

2    Association's motion for intervention, the regulated community is well aware of these

3    restrictions. Mark Doumit Declaration, ¶ 15. The Court would have to assume that these

4    operators will ignore federal law when conducting forest practices in owl habitat. Therefore, it

5    will be difficult, if not impossible, for Audubon to establish the causation required for

6    standing.

7         In addition, redressability in this case is highly speculative. It is not at all clear that

8    enjoining DNR's approval of FPAs would in fact prevent third-party actions resulting in take

9    under the ESA. Granting the relief requested and enjoining DNR from approving forest

10   practice applications will not stop further harvests of owl habitat. As explained earlier, if DNR

11   does not act on Class III and IV applications within 30 days, they are deemed approved by

12   action of state statute. To redress the claimed injury, the Court would have to order DNR to

13   take enforcement action on each application to prevent the approved forest practices, based

14   purely on federal law. As explained in Section III. D., this remedy is barred by the Tenth

15   Amendment. Also, an injunction against DNR would not be binding on those local

16   governments that have assumed regulation of forest land conversions. In the alternative, to

17   effectively redress the alleged injury, the Court would have to order the Board to adopt an

18   emergency rule banning the challenged forest practices. Again, the Tenth Amendment

19   prevents this Court from writing state forest practice regulations. Finally, the Court would

20   have to assume that operators willing to ignore federal law would abide by additional state law

21   restrictions.

22        In summary, Audubon bears the burden of establishing all of the elements required for

23   standing. To defeat the State Defendants' summary judgment motion, Audubon must produce

24   evidence of specific facts showing standing. For the reasons stated above, Audubon cannot

25   produce sufficient evidence to establish the causation and redressability elements required for

26   standing to bring their claims against State Defendants.

1   **F.      Audubon's Claim Regarding the Forest Practices Rules Outside of SOSEAs**
2   **Generally Is Not Ripe for Review.**

3        Audubon requests this Court to declare the Board regulations governing owl circles
4   outside of SOSEAs invalid and preempted by the ESA.  Complaint, Prayer for Relief, ¶ B.
5   This type of facial rule challenge or programmatic claim is not ripe for review, under *Ohio*
6   *Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998), and its progeny.  In *Ohio Forestry*,
7   the court ruled that the Sierra Club's challenge to a Land and Resource Management Plan for
8   the Wayne National Forest was not ripe for review.

9        The court considered three factors in determining whether the case was justiciable.
10  First, it considered whether withholding court consideration would cause the parties significant
11  hardship.  Second, the court considered whether immediate judicial review could hinder
12  agency efforts to refine its policies through revision or application of the Plan.  Third, the court
13  considered whether its review would benefit from the focus that a specific proposal could
14  provide.  In reaching the conclusion that such focus would benefit its review, the court
15  indicated that the abstract review of the Plan would require time-consuming consideration of
16  the "details of an elaborate technically based plan . . . ."  *Id.* at 736.

17       The Ninth Circuit has characterized *Ohio Forestry* as embracing "the eminently
18  sensible proposition that harm is best assessed when it is tangible, rather than theoretical."
19  *Wilderness Society v. Thomas,* 188 F.3d 1130, 1133 (9th Cir. 1999).  This circuit has also held
20  that programmatic challenges to agencies' substantive decisions are generally not ripe.
21  *Citizens for Better Forestry v. USDA*, 341 F.3d 961, 977 (9th Cir. 2003); *Laub v. Dep't of*
22  *Interior*, 342 F.3d 1080, 1087-88 (9th Cir. 2003).

23       Audubon contends that the forest practices rules do not prohibit the take of owls outside
24  of SOSEAs and that, by implementing these rules, DNR "takes" owls.  Complaint, ¶¶ 60, 81.
25  This claim attacks the forest practices rules on a programmatic level and is not ripe.

26

1    Consideration of the factors described in *Ohio Forestry* supports the conclusion that

2    Audubon's rule challenge is not ripe.

3            First, no significant hardship to Audubon would result from this Court's withholding of

4    review of the question of whether the rules generally "take" the spotted owl.  In *Ohio Forestry*,

5    the court noted that, because the Plan under consideration did not create any legal rights or

6    obligations, requiring the plaintiffs to bring their challenge in the context of a specific proposal

7    would not cause them significant hardship.  *Id.* at 733.  No harm would come to the plaintiffs

8    as a result of the Plan itself, without further decision-making by the Forest Service in which the

9    plaintiffs would have the opportunity to participate.

10           Similarly, with respect to Class III and Class IV applications, the forest practices rules

11   do not by themselves allow activities on the ground – DNR normally acts on such applications

12   within 30 days of receipt.  Young Declaration, ¶ 5.  Any person aggrieved by the approval of

13   an application may appeal that decision to the FPAB and, in conjunction with the appeal, may

14   request that the FPAB temporarily suspend the approval.  Wash. Rev. Code § 76.09.220(8)(a);

15   Wash. Admin. Code § 223-08-087.  Audubon could file an appeal of a specific approval,

16   request that the FPAB suspend the approval, and then seek resolution of the ESA issue in

17   federal court.  Any harm to Audubon resulting from this Court's dismissal of their rule

18   challenge would be a matter of inconvenience, not a "significant hardship" justifying

19   consideration of the programmatic challenge.

20           Second, court intervention at the programmatic level would hamper the Board's

21   ongoing review and update of its wildlife rules and its attempt to coordinate with the USFWS

22   on statewide owl recovery.  *See* Young Declaration, ¶ ¶ 16, 17.

23           Finally, this Court's review of Audubon's claim that the rules authorize take of the owl

24   would require time-consuming consideration of the details involved in determining whether the

25   rules on their face result in scientifically determined harm to the owl "without benefit of the

26

STATE DEFS' MOTION FOR SJ RE:                    20                   ATTORNEY GENERAL OF WASHINGTON
JURISDICTIONAL ISSUES AND                                                      1125 Washington Street SE
MEMORANDUM IN SUPPORT                                                                  PO Box 40100
THEREOF (NO. C06-1608 MJP)                                                    Olympia, WA  98504-0100
                                                                                      (360) 753-6200

1  focus that a particular logging proposal could provide."[14]  *Ohio Forestry*, 523 U.S. at 736.

2  Such review would require the Court to delve into complicated scientific data and analysis.

3  The question of whether a "take" has occurred involves consideration of the specific

4  circumstances surrounding the activity alleged to result in a take.  *See Defenders of Wildlife v.*

5  *Bernal*, 204 F.3d 920, 925 (9th Cir. 2000).  In the case of the spotted owl, these circumstances

6  would likely include the results of owl surveys for the circle in question, the geographic

7  location of a circle, the characteristics of the landscape surrounding the circle, and the quality

8  of available habitat.

9  In summary, Audubon's claim that the forest practices rules cause a take is a

10  nonjusticiable programmatic challenge and should be dismissed.

11  **G.    Under the *Burford* Abstention Doctrine, This Court Should Decline Review.**

12  Under the doctrine of *Burford* abstention,[15] the federal courts will abstain from

13  deciding certain cases in order to protect "complex state administrative processes from undue

14  federal interference."  *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 671 (9th Cir. 2004)

15  (quoting *Tucker v. First Md. Sav. & Loan, Inc.*, 942 F.2d 1401, 1404 (9th Cir. 1991)).  *Burford*

16  abstention is appropriate "where there have been presented difficult questions of state law

17  bearing on policy problems of substantial public import whose importance transcends the result

18  of the case at bar."  *Colorado River Water Conservation Dist. v. United States*, 424 US 800,

19  814-16 (1976).  The court will normally dismiss an action where it finds *Burford* abstention to

20  be appropriate.  *Poulos*, 379 F.3d at 671.

21  In *Sierra Club v. City of San Antonio,* 112 F.3d 789 (5th Cir. 1997), the Sierra Club

22  brought an action against state and local regulatory agencies, alleging that water usage

23  regulated by the defendants was taking an endangered species.  The district court issued an

24

---

25  [14] Audubon has made allegations with respect to particular forest practice application approvals.  The portion of their claims at issue here is the general allegation that the Board has under-regulated forest practices in owl territories outside of SOSEAs.

26  [15] *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

1   injunction and the defendants appealed.   The Fifth Circuit reversed, holding that *Burford*

2   abstention was warranted.   *Id.* at 791-93.   The appellate court described the factual

3   circumstances supporting abstention:   the "elaborate and comprehensive nature of the state

4   regulatory scheme in issue;" the natural resource at issue was "a matter of great state concern;"

5   and the "need for unified management and decision-making." *Id.* at 793-94.   The court held

6   that the purpose of *Burford* abstention was to "discourage such federal court second-guessing

7   of state regulatory matters," and stated that *Burford* abstention is particularly appropriate

8   where the federal district court could have reached a different result than the state agencies

9   with greater interest in and familiarity with the issues. *Id.* at 796.

10       The Sierra Club argued that "abstention is not warranted because it only seeks relief

11   under a federal law, the Endangered Species Act." *Id.* at 795.   The court disagreed and held

12   that this type of abstention did not turn on whether the plaintiff's cause of action was alleged

13   under federal or state law, but whether the claim was entangled in state law that must be

14   untangled before the federal case can proceed. *Id.*   The court concluded that abstention could

15   be "warranted where the plaintiff claims a federal statutory violation." *Id.* at 796.   The Sierra

16   Club also argued "that abstention should not apply because there is no state administrative

17   proceeding underway with which the federal proceeding is in conflict." *Id.*  at 798.   Again, the

18   court disagreed, holding that "*Burford* abstention does not require the existence of an ongoing

19   state proceeding with which the federal court action directly interferes." *Id.*

20       The *Sierra Club* case is directly on point.   The Forest Practices Act and associated rules

21   constitute a comprehensive statewide regulatory system involving natural resources of great

22   state concern, and provide a vehicle for unified management and decision-making.   When

23   enacting the Forest Practices Act, the Washington State Legislature declared that it was in the

24   public interest to create "a comprehensive statewide system of laws and forest practices rules."

25   Wash. Rev. Code § 76.09.010(2).   The Legislature also found that "forest land resources are

26   among the most valuable of all resources in the state . . . a viable forest products industry is of

STATE DEFS' MOTION FOR SJ RE:         22       ATTORNEY GENERAL OF WASHINGTON
JURISDICTIONAL ISSUES AND                1125 Washington Street SE
MEMORANDUM IN SUPPORT                   PO Box 40100
THEREOF  (NO. C06-1608 MJP)               Olympia, WA  98504-0100
                                       (360) 753-6200

1   prime importance to the state's economy," and that "it is in the public interest for public and

2   private commercial forest lands to be managed consistent with sound policies of natural

3   resource protection." *Id.* at (1).

4       The fact that this case is brought under federal law is not determinative, as the issues

5   are deeply entangled in state law matters.  The Board is currently in the process of reviewing

6   its upland wildlife rules and has specifically evaluated the owl rules.   After carefully

7   considering the latest scientific information, the Board chose to wait for the pending federal

8   owl recovery plan before making a final decision on amendments to the owl rules.  The Board

9   decided that a comprehensive, coordinated state-federal approach would better serve the owl.

10  Young Declaration, ¶ ¶ 16, 17.

11      Audubon's main purpose in bringing this challenge is to effect a change in the state

12  regulatory system.  They have tried, and failed, to effect these changes at the state level and are

13  now seeking a federal forum for their concerns.  The Court should abstain from engaging in

14  this complex and technically-based approach for resolving these locally-important and

15  competing policy interests.  This Court should decline Audubon's request to second guess state

16  policy choices on how to regulate forest practices and protect the state's natural resources.

17                          **IV.    CONCLUSION**

18      For the reasons stated above, the State Defendants ask this Court to grant their motion

19  for summary judgment and dismiss Audubon's First and Second Claims for Relief.

20      RESPECTFULLY SUBMITTED this 25th day of January, 2007.

21                          ROBERT M. MCKENNA
                            Attorney General
22

23                          PATRICIA H. O'BRIEN, WSBA #11484
                            JON P. FERGUSON, WSBA #5619
24                          Senior Assistant Attorneys General
                            NEIL L. WISE, WSBA #21250
25                          SHEILA D. LYNCH, WSBA #26343
                            Assistant Attorneys General
26                          Attorneys for State Defendants