1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SEATTLE AUDUBON SOCIETY, et al.,

                    Plaintiffs,

v.

DOUG SUTHERLAND, et al.,

                    Defendants.

No. CV06-1608MJP

ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS
FOR SUMMARY JUDGMENT

13
14
15
16
17
18

     This matter comes before the Court on motions for summary judgment brought by State Defendants and Intervenors. (Dkt. Nos. 54, 61.)  Defendant Weyerhaeuser joins in the motions. (Dkt. No. 60.)  Audubon opposes the motions. (Dkt. No. 75.)  Having reviewed the parties' briefs, the documents submitted in support thereof, and the record herein, and having heard oral argument on the issues, the Court GRANTS IN PART and DENIES IN PART the motions for summary judgment.

19

**Background**

20
21
22
23
24
25
26

     Plaintiffs in this action — Seattle Audubon Society and Kittitas Audubon Society ("Audubon") — are non-profit membership organizations dedicated to the protection and enjoyment of birds and their natural habitat. (Compl. ¶ 11.)  In this Endangered Species Act ("ESA") action, Audubon has sued various state agencies and officials and the Weyerhauser Company for unlawful "take" of northern spotted owls.  Audubon's first two claims are against the Washington State Department of Natural Resources ("Department"), the Washington Forest Practices Board ("Board"), and all individual Board members, as well as Doug Sutherland, who is the Washington

Commissioner of Public Lands, administrator and manager of the Department, and chair of the Board, and Vicki Christiansen, a Department director and a member and alternate chair of the Board.[1] Audubon's third claim is against Weyerhauser.

The pending summary judgment motions only involve the first two claims.  In its first claim, Audubon contends that Defendants Sutherland, Christiansen, and the Department "take" spotted owls in violation of § 9 of the ESA by approving certain forest practice applications that result in significant destruction of spotted owl habitat and disrupt owl behavioral patterns.  In its second claim, Audubon contends that the Board and its individual members have issued regulations that authorize "take" of spotted owls and that those regulations are preempted by the ESA.  Audubon seeks the following relief: (1) a declaration that state officials are taking spotted owls by approving forest practice applications authorizing private landowners to conduct certain forest practices in owl circles outside of spotted owl special emphasis areas ("emphasis areas"); (2) a declaration that state forest practices regulations are preempted by federal law to the extent they authorize logging that results in "take" of spotted owls; and (3) an injunction barring approval of forest practice applications authorizing destruction of owl habitat in owl circles outside of emphasis areas until State Defendants provide assurances that such approvals do not violate the ESA.

In January 2007, the Washington Forest Protection Association and American Forest and Paper Association ("Intervenors") intervened in this suit. (Dkt. No. 49.)

State Defendants and Intervenors (collectively "Defendants") have moved for summary judgment, arguing that: (1) Audubon's claims are barred by state sovereign immunity and absolute legislative immunity; (2) Audubon does not have standing; (3) Audubon's challenge is not ripe for review; (4) the Court does not have jurisdiction because State Defendants cannot violate the prohibition against "taking" endangered species under these alleged facts; (5) Audubon's requested relief is barred by the Tenth Amendment; and (6) the Court should decline review under the Burford abstention doctrine.

---

[1]     The Court refers to these defendants collectively as "State Defendants."

**Discussion**

**I.**      **Statutory & Regulatory Background**

   **A.**      **Endangered Species Act**

Under the Endangered Species Act, it is unlawful for any "person" to "take" endangered or threatened species. 16 U.S.C. § 1538(a)(1)(B) (2000) (the "take" prohibition); 50 C.F.R. § 17.31(a). It is equally unlawful for any "person" "to attempt to commit, solicit another to commit, or cause to be committed" a "take." 16 U.S.C. § 1538(g).  Defined broadly, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect[.]" 16 U.S.C. § 1532(19). "Harm" is defined in the regulations as "an act which actually kills or injures wildlife" and includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.  "Harass" is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.  The statute defines "person" to include "an individual, corporation . . . any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State," and "any State, municipality, or political subdivision of a State." 16 U.S.C. § 1532(13).

An "endangered species" is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).  A "threatened species" is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).  In 1990, the U.S. Fish & Wildlife Service ("Fish & Wildlife") listed the northern spotted owl ("spotted owl") as "threatened." 55 Fed. Reg. 26,114 (June 26, 1990).

In 2004, Fish & Wildlife completed a five-year status review of the spotted owl and recommended that the species remain listed as threatened. (Young Decl. ¶ 8.)  The review indicated that the spotted owl population continues to decline, and that the decline may be greater in Washington than in Oregon or California. (Id.)  In March 2006, Fish & Wildlife announced its intent

to develop a recovery plan for the spotted owl.  Work on this plan is continuing and Fish & Wildlife intends to produce a final recovery plan by November 2007. (Id.)  The State is "actively represented" on the recovery team and has been participating in those efforts since May 2006. (Id. ¶ 17.)

Audubon brings its claims under section 11(g) of the ESA, which authorizes civil suits "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision" of the Act. 16 U.S.C. § 1540(g)(1)(A).

### B.      State Regulation of Private Timber Lands

State regulation of forest practices on both state and private lands is governed primarily by the Forest Practices Act ("Act"), RCW 76.09 et seq. (1994).  The Act is implemented by three separate agencies. The Forest Practices Board ("Board") promulgates forest practice rules to implement the Act. RCW 76.09.040–.050.  The Department of Natural Resources ("Department") implements and enforces the forest practice rules.  As part of its duties, the Department reviews, approves, and conditions forest practices applications. RCW 76.09.050–.060.  The Forest Practices Appeals Board hears appeals from the Department's decisions regarding forest practices. RCW 76.09.220.

The Board classifies forest practices depending on the impact the practice has on the environment.  Class I and II practices do not require Department approval. RCW 76.09.050(1). Class III and IV practices have greater potential for damaging a public resource and therefore require Department approval. Id.  Class III forest practices applications are exempt from State Environmental Policy Act ("SEPA") review and must be approved by the Department within thirty days. Id.  The forest practice applications at issue in this litigation are Class III applications approved by the Department without SEPA review. (Plf.'s Resp. at 5.)

In 1996, the Board adopted rules pertaining to spotted owls.  The Board created ten "Spotted Owl Special Emphasis Areas" ("emphasis areas"). See WAC § 222-16-086.  Inside emphasis areas, the rules require additional environmental review under SEPA for logging of suitable owl habitat

within 0.7 miles of a spotted owl "site center."[2] <u>See</u> WAC 222-10-041(4), 222-16-080(1)(h).  The rules also require additional environmental review when logging results in less than a prescribed amount of suitable habitat in a "median home range circle."[3] <u>See</u> WAC 222-10-041(4), 222-16-080(1)(h).  Outside emphasis areas, the rules require environmental review of proposals to log the best 70 acres of suitable owl habitat around a site center only during the six-month nesting season. WAC 222-10-041(5), 222-16-080(1)(h)(iii).  During the rest of the year, the regulations do not require further environmental review for forest practices in spotted owl habitat around an owl site center. <u>See</u> WAC 222-10-041, 222-16-080(1)(h).

## II.    Immunity Issues

### A.    Eleventh Amendment Sovereign Immunity

The Eleventh Amendment prohibits federal courts from entertaining actions by private citizens against state governments, including state agencies and officers, unless the state has consented to suit. <u>Nat. Res. Defense Council v. Cal. Dept. of Transp.</u>, 96 F.3d 420, 421 (9th Cir. 1996).  One exception to this general rule is that a person may bring a claim for declaratory and injunctive relief against state officials who act in violation of federal law.  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 102 (1984); <u>Ex Parte Young</u>, 209 U.S. 123, 159-60 (1908).

Defendants argue and Audubon concedes that the Eleventh Amendment bars its suit against the Board and the Department.  Because the state agencies are immune from suit, <u>see</u> <u>Nat. Res. Defense Council</u>, 96 F.3d at 421, the Court dismisses Audubon's claims against the Department and Board.  But Audubon's claims against the individual Board members and Department officials are not similarly barred because Audubon only seeks prospective equitable relief against these individual state officials. <u>See</u> <u>Pennhurst</u>, 465 U.S. at 102.

---

[2]    A "northern spotted owl site center" is the location of one or more northern spotted owls. WAC 222-16-010.

[3]    "Median home range circle" is defined as "a circle, with a specified radius, centered on a spotted owl site center." WAC 222-16-010.

**B.     Legislative Immunity**

Defendants also argue that Audubon's claims against the individual Board members should be dismissed on grounds of absolute immunity.  The absolute immunity of legislators from civil suits for performance of their lawmaking functions is well-rooted in the common law.  See Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  This immunity extends to federal, state, and regional legislators.  Bogan v. Scott-Harris, 523 U.S. 44, 46 (1998).  It also extends to suits both for money damages and equitable remedies. See Sup. Ct. of Va. v. Consumers Union, 446 U.S. 719, 731-34 (1980); see also Spallone v. United States, 493 U.S. 265, 278 (1990).  The Supreme Court employs a "functional" approach to determining whether a government official deserves absolute immunity for a particular action: "[a]bsolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." Bogan, 523 U.S. at 54.  Thus, the Supreme Court has extended legislative immunity to regulators for their quasi-legislative actions.  See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 405 (1979) (holding that members of interstate regional planning agency were absolutely immune from federal damages liability for injury inflicted while acting in a legislative capacity).

The individual Board members deserve absolute immunity for their quasi-legislative actions.  Here, Audubon has sued the Board members for "promulgat[ing] and maintain[ing] forest practice regulations that purport to authorize the take of Spotted Owls in owl circles outside of [emphasis areas] in violation of federal law." (Compl. ¶ 84.)  Audubon does not dispute that the act of "promulgating and maintaining" regulations is a quasi-legislative act for which the individual Board members deserve absolute immunity.  The Court concludes that the individual Board members are absolutely immune from Audubon's claims here.  Audubon's claims against the individual Board members are therefore dismissed.

Although Defendants Sutherland and Christensen are Board members, they are also sued in their capacity as Department administrators.  As Department administrators, Sutherland and Christensen regulate forest practices through the review of forest practice applications in a manner

consistent with Board regulations.  Because they are acting as implementors and enforcers, rather than as quasi-legislators, they do not enjoy legislative immunity in their role as Department administrators.  Defendants Sutherland and Christensen are therefore not dismissed from this action.

**III.    Standing**

Defendants argue that Plaintiffs do not have standing to bring this suit.  In order to satisfy Article III standing requirements, a plaintiff must show:

> (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81 (2000).  Here, Defendants challenge Audubon's standing on both causation and redressability grounds.

**A.    Causation**

Plaintiffs must show that the alleged injury — take of spotted owls — is fairly traceable to the challenged state action.  Id.  Injury that results from the "independent action of some third party not before the court" does not satisfy the causation requirement. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  But a "chain of causation [may have] more than one link" and still satisfy the standing requirement, as long as the connection between the injury and cause is not "hypothetical or tenuous." Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 849 (9th Cir. 2002).  In Davis, the Ninth Circuit held that plaintiffs had standing to challenge "Proposition 4," which banned the use of certain leghold traps to capture or kill wildlife in the State of California.  Prior to passage of the proposition, federal officials had used leghold traps to protect several bird species. Id. at 844.  Plaintiffs' injury — risk of harm to birds — was fairly traceable to Proposition 4 because the federal government removed traps in direct response to the proposition, removal of the traps leads to a larger population of predators, and more predators decreases the number of birds. Id. at 849.  Even though the "chain of causation [had] more than one link," the court concluded that plaintiffs' injury was fairly traceable to the proposition. Id.  Likewise, in Loggerhead Turtle v. Volusia County, 148 F.3d 1231, 1247-49 (11th Cir. 1998), the Eleventh Circuit found that plaintiffs' injury — take of sea turtles —

1   was fairly traceable to the county's refusal to regulate artificial beachfront lighting on private

2   property.  The court concluded that the county's "indirect control over lighting" was sufficient for

3   causation for standing, "even though the actions or inactions of those third parties not before the

4   court may be another cause of the harm." Id. at 1253.

5           In this case, Defendants argue that any alleged injury cannot be traced to the actions of state

6   officials because there are intervening actors, i.e. the operators who actually log spotted owl habitat.

7   But Plaintiffs do not need to show for standing purposes that State Defendants are the only cause, or

8   even the proximate cause, of the alleged harm. See Loggerhead Turtle, 148 F.3d at 1251 n.23

9   (rejecting defendant's argument that plaintiffs need to show that defendant is proximate cause of

10  alleged harm for standing purposes); see also Davis, 307 F.3d at 849.  The alleged destruction of

11  spotted owl habitat on private lands is fairly traceable to State Defendants' actions because State

12  Defendants enforce the rules governing such logging operations and the independent logging

13  operators cannot conduct Class III applications on their private lands without the authorization of the

14  Department. See RCW 76.09.050.  Moreover, Audubon does not need to show that it is certain that

15  timber companies will conduct the forest practices for which they obtain approval.  Because it is not

16  "hypothetical or tenuous" that timber companies will actually conduct the forest practices for which

17  they have requested and received Department approval, and because State Defendants are properly

18  considered a "link in the causation chain," Plaintiffs have met the causation prong of the standing test.

19  See Davis, 307 F.3d at 849.

20          **B.      Redressability**

21          Plaintiffs must also show that it is "likely, as opposed to merely speculative, that the injury

22  will be redressed by a favorable decision." Lujan, 504 U.S. at 561.  Defendants argue that Plaintiffs'

23  alleged injury can only be redressed through injunctive relief that would violate the Tenth

24  Amendment.  Defendants also argue that the requested injunctive relief — enjoining state officials

25  preliminarily from approving any future forest practice applications in owl circles outside of emphasis

26  areas — will not remedy Plaintiffs' injury because, by operation of statute, any forest practice

applications not approved by the Department within thirty days of application are considered approved. See RCW 76.09.050(5).

As explained more thoroughly below, the Tenth Amendment does not prevent courts from ordering state officials to comply with federal law. See New York v. United States, 505 U.S. 144, 179 (1992). And even if injunctive relief were not available, the redressability prong of the standing inquiry would likely be satisfied by Audubon's claim for declaratory relief. See Franklin v. Massachusetts, 505 U.S. 788, 801–03 (1992) (holding redressability prong satisfied by request for declaratory relief even though any actual change would require discretionary determination by President); Alaska Fish & Wildlife Fed'n & Outdoor Council v. Dunkle, 829 F.2d 933, 937 (9th Cir. 1987) ("There is a substantial likelihood that declaratory relief in the form of a declaration that closed-season subsistence hunting violates federal law will redress the injury."). Because it is likely that state officials would conform their actions to avoid a violation of federal law, a declaratory judgment would likely redress Plaintiffs' alleged injury. Lujan, 504 U.S. at 561.

Because Plaintiffs have shown that their alleged injury is fairly traceable to State Defendants' actions and because it is likely that their alleged injury will be redressed by a favorable decision, Plaintiffs have standing to pursue their claims against the remaining State Defendants.

**IV.     Ripeness**

Citing Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726 (1998), Defendants argue that Audubon's claims are not ripe. In Ohio Forestry, the Supreme Court ruled that plaintiffs' facial challenge to a Land and Resource Management Plan for a state forest was not ripe for review. 523 U.S. at 728. The Court pointed to three relevant factors for the ripeness inquiry: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Id. at 733. The Ninth Circuit has noted that Ohio Forestry stands for the proposition that "harm is best assessed when it is tangible rather than theoretical." Wilderness Soc'y v. Thomas, 188 F.3d 1130, 1133 (9th Cir. 1999).

1    Judicial intervention here will not interfere with further administrative action.  Audubon

2   correctly points out that the Forest Practices Appeals Board has declared that it has no jurisdiction to

3   adjudicate ESA claims, and that the Department's obligations and sphere of review are limited to the

4   regulations promulgated by the Board.  Repar v. Dep't of Natural Res., FPAB No. 05-001, 2005 WL

5   2845720, at *8 (Wash. Forest Practices App. Bd. 2005).  Because Plaintiffs allege that owl takes

6   have occurred through permits approved under the current regulations, and because the Department

7   lacks the power to enforce the ESA beyond those regulations, further administrative actions will not

8   likely address Plaintiffs' claims.  See id.  Plaintiffs also correctly point out that the time periods for

9   mandatory action on filed permits (thirty days) and requisite notice under the ESA for plaintiffs to

10   seek injunctive relief (sixty days) preclude Plaintiffs from gaining meaningful relief through state

11   agencies.  See RCW 76.09.050; 16 U.S.C. § 1540(g)(2)(A).

12    The other two prongs of Ohio Forestry likewise militate in Audubon's favor.  Audubon

13   correctly notes that, unlike the plan in Ohio Forestry, Department approval of forest practice

14   applications gives the applicants a legal right to cut trees.  Cf. 523 U.S. at 733.  Any delay in judicial

15   action on Plaintiffs' claims will consequently constitute a substantial (and irreparable) hardship.  See

16   Pac. Rivers Council v. Brown, No. CV02-243BR, 2002 WL 32356431, at *2–4 (D. Or. Dec. 23,

17   2002) (holding that plaintiffs' ESA challenge to Oregon's ongoing approval of logging permits was

18   ripe for review).  Moreover, Plaintiffs' claims are not a facial attack on a broad management plan, as

19   in Ohio Forestry.  Plaintiffs have alleged past ESA violations as well as ESA violations that are

20   underway and ongoing and have pointed out specific owl circles that are threatened by the State's

21   practices.  (See Compl. ¶¶ 64-74.)  The Court will be able to evaluate alleged retrospective and

22   prospective harms and will be presented with sufficient facts to address Plaintiffs' claims.  Therefore,

23   because judicial review will not interfere with further administrative action, because delay will result

24   in hardship, and because further factual development is unnecessary, this case is ripe for judicial

25   review.

26

ORDER - 10

**V.      Citizen Suit Jurisdiction**

The citizen suit provision of the ESA states that any person may commence a civil suit to enjoin any person "alleged to be in violation" of the ESA and that the district courts shall have jurisdiction over such suits. 16 U.S.C. § 1540(g).  Defendants argue that the Court does not have jurisdiction because Defendants are not in violation of the ESA.  Defendants argue that state officials cannot be held liable for ESA violations allegedly committed by private parties and that therefore, as a matter of law, they are not the cause of any ESA take.  Plaintiffs argue that both the language of the ESA and case law support the position that a government official is liable for take resulting from activities undertaken by others pursuant to the official's specific authorization.

**A.      The plain language of the ESA supports Plaintiffs' theory that government officials may be held liable for authorizing take.**

The plain language of the ESA supports the proposition that a government official violates the ESA take prohibition when that official authorizes someone to exact a taking of an endangered species, which, but for the authorization, could not have taken place.  It is unlawful under the ESA for "any person" to "take" any endangered or threatened species within the United States. 16 U.S.C. § 1538(a)(1)(B).  It is equally unlawful for "any person" to "cause to be committed" take. 16 U.S.C. § 1538(g).  The statute defines "person" broadly to include states, state entities, and state officers. 16 U.S.C. § 1532(13).  Thus, the statute not only prohibits a party from directly causing take, but also prohibits a party, including state officials, from bringing about the acts of another party that exact a taking. See Strahan v. Coxe, 127 F.3d 155, 163 (1st Cir. 1997).

Defendants argue that other provisions in the statute suggest that Congress did not intend that states would be held liable for authorizing third-party take.  Section 6 of the Act directs the Secretary of the Interior to cooperate with states regarding protection of endangered species. 16 U.S.C. § 1535.  Section 7 requires all federal agencies, in consultation with the Secretary, to carry out programs for the conservation of endangered and threatened species. 16 U.S.C. § 1536(a)(1).  And section 7 also requires every federal agency to ensure that any action "authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any endangered or

1  threatened species. 16 U.S.C. § 1536(a)(2). Defendants argue that because the statute makes state

2  participation voluntary and because the statute does not include parallel provisions regarding state

3  regulatory responsibilities, Congress did not intend states to have a "duty to regulate" in this area.

4  But the fact that Congress imposed increased regulatory responsibilities on federal agencies and made

5  state participation in a regulatory program voluntary is a separate issue from whether Congress

6  intended to make states liable when they authorize others to take endangered species. The plain

7  language of the statute makes states and state officials liable when they "cause to be committed" take.

8  See 16 U.S.C. §§ 1532(13), 1538(a)(1)(B), 1538(g).

9         In addition, Defendants mischaracterize Audubon's claims. Audubon is not claiming that the

10 State has an affirmative duty to regulate to prevent take. Instead, Audubon claims that state officials

11 have an obligation to avoid approving forest practice applications that authorize specific forest

12 practices that pose a reasonably certain threat of harm to spotted owls, and that where state

13 regulations are applied to authorize such activities, they are preempted by federal law. (Plf.'s Resp. at

14 41.) As the district court explained in response to a virtually identical argument in Brown, Plaintiffs

15 are not arguing that the state officials failed to regulate strictly enough, but instead assert that State

16 Defendants' "authorization of logging operations that are likely to result in take is itself a cause of

17 take." 2002 WL 32356431, at *11.

18        Finally, Defendants argue that Plaintiffs' interpretation of the statute fails because the ESA

19 does not contain a "clear statement" that Congress intended states to have to police against third-

20 party take. (Intervenors' Mot. at 11 n.11.) Defendants base their argument on Solid Waste Mgmt.

21 Agency of N. Cook County ("SWANCC") v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 173 (2001),

22 in which the Supreme Court stated that "[w]here an administrative interpretation of a statute invokes

23 the outer limits of Congress' power, we expect a clear indication that Congress intended that result."

24 The Court concluded that the Clean Water Act did not contain a "clear statement" from Congress

25 that it intended section 404 of the Clean Water Act to reach intrastate sand and gravel pits.

26 SWANCC, 531 U.S. at 174. Defendants argue that the ESA similarly does not contain any clear

1    statement regarding states' duties to use their regulatory programs to police against take. But, as

2    explained above, Audubon is not arguing that the ESA requires states to police against take. And the

3    plain language of the statute provides a "clear statement" that Congress intended that states would be

4    held liable for causing ESA take. See 16 U.S.C. §§ 1532(13), 1538(a)(1)(B), 1538(g).

5         **B.    Other courts have held government officials liable for authorizing take.**

6         Courts have repeatedly held government officers liable for violating the take prohibition when

7    the officers authorized activities undertaken by others that caused take. For example, the Eighth

8    Circuit held that the Environmental Protection Agency caused illegal take by its decision to register

9    pesticides containing strychnine used by farmers and ranchers. Defenders of Wildlife v. EPA, 882

10   F.2d 1294, 1301 (8th Cir. 1989). Likewise, the Fifth Circuit held that the Forest Service caused

11   illegal take of endangered red-cockaded woodpeckers by implementing a timber management plan

12   allowing timber companies to clear-cut. Sierra Club v. Yeutter, 926 F.2d 429, 438-39 (5th Cir. 1991).

13   Moreover, in Strahan v. Coxe, 127 F.3d 155 (1st Cir. 1997), the First Circuit held Massachusetts

14   officials liable under the ESA for licensing commercial fishermen to use gillnets and lobster pots in a

15   manner that was likely to take endangered whales. As that court explained:

16       The [ESA] not only prohibits the acts of those parties that directly exact the taking, but
         also bans those acts of a third party that bring about the acts exacting a taking . . . . [A]
17       governmental third party pursuant to whose authority an actor directly exacts a taking of
         an endangered species may be deemed to have violated the provisions of the ESA.

18   Id. at 163. The court differentiated the state's licensure of gillnets and lobster pots from drivers'

19   licensing; in the latter situation, the violation of federal law is caused only by the actor's conscious

20   and independent decision to disregard or go beyond the licensed purposes of her automobile use and

21   violate the law. Id. at 164. Because it was not possible for licensed commercial fishing operations to

22   use their gillnets or lobster pots in the manner permitted by state officials without risk of violating the

23   ESA take prohibition, the state officials indirectly caused the take. Id.; see also United States v. Town

24   of Plymouth, 6 F. Supp. 2d 81, 90-91 (D. Mass. 1998) (holding town liable for take of piping plovers

25   caused by private off-road vehicle use on town beach and ordering town to prohibit such vehicle use);

26

ORDER - 13

1    Brown, 2002 WL 32356431, at *12 (concluding that state forester may be held liable for ESA take

2    caused by private logging operations).

3            At oral argument, counsel for Intervenors argued that in subsequent decisions, courts in the

4    First Circuit have backed away from the decision in Strahan v. Coxe.  Counsel cited two cases that

5    purportedly evidence the questionable viability of Coxe — Strahan v. Pritchard and Strahan v.

6    Linnon.  Counsel's oral representations are inaccurate.  Pritchard is a district court decision in which

7    the court decided that the state was not liable for take of endangered whales, not as a matter of law,

8    but because the plaintiff had presented "no conclusive evidence demonstrating that protected whales

9    have, since 2002, become entangled in Massachusetts coastal waters or in fishing gear licensed by the

10   defendants." Strahan v. Pritchard, 473 F. Supp. 2d 230, 238 (D. Mass. 2007).  The district court

11   based its decision not to impose liability on a lack of conclusive evidence, rather than a legal theory

12   that states cannot be held liable for authorizing take.

13           Likewise, the First Circuit did not back away from the Coxe decision in its unpublished

14   decision in Linnon.  Instead, the court referred to its reasoning in Coxe when it concluded that the

15   Coast Guard was not liable for takings caused by non-Coast Guard vessels that it permits to operate:

16           The Coast Guard's issuance of Certificates of Documentation and Inspection is
             analogous to the licensure of automobiles and drivers.  The vessel owner or operator
17           is an independent actor who is, himself, responsible for complying with environmental
             and other laws. Accordingly, by issuing the necessary permits to operate, the Coast
18           Guard does not subject itself to liability for crimes, including takings, that actor may
             commit. Cf. Strahan v. Coxe, 127 F.3d 155, 163-64 (1st Cir. 1997) (contrasting the
19           state's licensure of commercial fishing operations to use gillnets and lobster pots in a
             specific manner with its licensure of automobiles and drivers).

20   Strahan v. Linnon, No. 97-1787, 1998 U.S. App. LEXIS 16314, at *14 (1st Cir. July 16, 1998)

21   (unpublished opinion).  Thus, the court drew the same distinction that it had in Coxe — a distinction

22   between licensing the actual activity that causes the take, and licensing an activity, during the pursuit

23   of which, an actor independently causes take.

24           That distinction is relevant here.  Defendants argue that state officials cannot be held liable for

25   the "independent" actions of timber operators who cause take.  But timber operators are not

26   "independent actors" like licensed boaters who hit endangered whales with their boats, or licensed

1   drivers who cause accidents.  Instead, Plaintiffs allege that the operators here are specifically

2   authorized by the Department to undertake forest practices that are likely to take spotted owls.  (See

3   Compl. ¶ 81.)

4          Defendants also argue that this case is distinguishable from Coxe because the state regulations

5   specifically warn operators that compliance with the Forest Practices Act does not ensure compliance

6   with the ESA or other federal laws.  See WAC 222-50-020(5).  But that warning does not alter state

7   officials' authorization of activities that are likely to take spotted owls.  Although the state

8   regulations do not assure compliance with the ESA, they purportedly authorize activities that violate

9   the ESA.  It is that authorization that makes state officials potentially liable.

10          Defendants have not cited any cases that persuasively support their position that state officials

11  may not be held liable for ESA take when they authorize individuals to undertake activities that pose

12  a likely risk of causing ESA take.  The few cases that they rely on are distinguishable from this case.

13  See, e.g., Linnon, 1998 U.S. App. LEXIS 16314; Loggerhead Turtle v. Volusia County, 92 F. Supp.

14  2d 1296, 1307-08 (M.D. Fla. 2000) (concluding that county was not liable for illegal take of

15  endangered turtles where the county banned artificial beachfront lighting, but some residents did not

16  comply with the ordinance).  Defendants rest their arguments almost entirely on law review articles

17  criticizing the First Circuit's decision in Coxe and the Eleventh Circuit's decision in Loggerhead

18  Turtle.  Although scholarly articles may aid courts in parsing difficult legal issues, these articles are

19  unpersuasive here where numerous courts have already decided these issues.

20          **C.      Proximate Causation**

21          Defendants argue that they cannot be held liable for any alleged take because they are not the

22  "proximate cause" of any harm to spotted owls.  In Babbit v. Sweet Home Chapter of Communities,

23  the Supreme Court noted that the regulatory definition of "harm" is subject to "ordinary requirements

24  of proximate causation and foreseeability."  515 U.S. 687, 696 n.9 & 700 n.13 (1995).  Thus, Sweet

25  Home established that proximate causation is a relevant consideration in the ESA take inquiry.

26

Defendants argue that under no circumstances can Plaintiffs show that the State Defendants are the "proximate cause" of take here.

As the Court recognized in <u>Sweet Home</u>, the "take" inquiry is a fact-dependant one:

> In the elaboration and enforcement of the ESA, the Secretary and all persons who must comply with the law will confront difficult questions of proximity and degree; for, as all recognize, the Act encompasses a vast range of economic and social enterprises and endeavors. These questions must be addressed in the usual course of the law, through case-by-case resolution and adjudication.

<u>Id.</u> at 708; <u>see also</u> <u>id.</u> at 713 (O'Connor, J., concurring) (noting that "[t]he task of determining whether proximate causation exists in the limitless fact patterns sure to arise is best left to lower courts").

As Justice O'Connor noted in her concurrence in <u>Sweet Home</u>, "[p]roximate causation is not a concept susceptible of precise definition." <u>Id.</u> at 713 (O'Connor, J., concurring). Black's Law Dictionary defines "proximate cause" as (1) a cause that is legally sufficient to result in liability; an act or omission that is considered in law to result in a consequence, so that liability can be imposed on the actor; and (2) a cause that directly produces an event and without which the event would not have occurred. <u>Black's Law Dictionary</u> 234 (8th ed. 2004). Washington courts define proximate cause as a cause "which, in a direct sequence unbroken by any new independent cause, produces the injury complained of, and without which such injury would not have happened." <u>Fisher v. Parkview Props., Inc.</u>, 71 Wn. App. 468, 476, 859 P.2d 77 (1993) (citing <u>Alger v. Mukilteo</u>, 107 Wn.2d 541, 545, 730 P.2d 1333 (1987)). As explained by Professor Dobbs, proximate cause does not mean "sole" cause: "several wrongdoers are frequently proximate causes of harm." 1 Dan B. Dobbs, <u>The Law of Torts</u> § 180, at 444 (2001). Proximate cause is also linked to foreseeability: "[t]he most general and pervasive approach to proximate cause holds that a negligent defendant is liable for all kinds of harms he foreseeably risked by his negligent conduct." <u>Id.</u> The definition of proximate cause is fluid, in part, because it merely reflects "the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. . . . As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the

law is justified in imposing liability." W. Page Keeton, et al., <u>Prosser and Keeton on the Law of Torts</u> § 41, at 264 (5th ed. 1984); <u>see also</u> <u>Sweet Home</u>, 515 U.S. at 713 (O'Connor, J., concurring) (noting that proximate causation "normally eliminates the bizarre" and "depends to a great extent on considerations of the fairness of imposing liability for remote consequences").

The Court cannot decide the proximate cause question as a matter of law.  The alleged harm to spotted owls is not so remote or unforeseeable that the Court can conclude at this stage that State Defendants never proximately cause take when they approve certain forest practice applications. Department approval is a condition precedent to the logging operations; without Department approval, private timber operators cannot execute Class III forest practices. RCW 76.09.050(2). Moreover, Plaintiffs allege that it is not possible for the holder of a forest practice application authorizing the logging of owl habitat in an occupied owl circle outside an emphasis area to conduct logging operations in the matter permitted by the State without risk of violating the ESA.  Thus, it is foreseeable that the Department's actions will cause the alleged harm.  Indeed, the First Circuit in <u>Coxe</u> and other courts have held that state officials cause take when they authorize activities that, when conducted by individuals as specifically permitted by the state, will foreseeably result in take of listed species. <u>See</u> <u>Coxe</u>, 127 F.3d at 163-64; <u>Brown</u>, 2002 WL 32356431, at *11-12.  Because the Court cannot conclude as a matter of law that proximate cause does not exist, Plaintiffs' suit will move forward on this issue.

**D.    Policy Considerations**

Finally, Defendants raise numerous policy arguments against finding state officials liable here. For example, Defendants argue that if they had not regulated private logging operations at all, the Court could not hold them liable for take. <u>See</u> Jonathan H. Adler, <u>Judicial Federalism and the Future of Federal Environmental Regulation</u>, 90 Iowa L. Rev. 377, 429 (2005) (analyzing <u>Coxe</u> and noting that "[i]f the state refrained from regulating gillnet and lobsterpot fishing altogether, the only way to mandate state enforcement of an anti-take prohibition would be to commandeer state officials" in

1   violation of the Tenth Amendment).  Defendants also argue that imposing liability on state officials

2   here penalizes the state for Fish & Wildlife's failure to adequately enforce federal law.

3          Although Defendants raise important policy considerations, these considerations do not

4   override the plain language of the Act which prohibits states and state officials from causing take to

5   be committed.  And these considerations do not override the foremost policy of the ESA, which is to

6   protect endangered species.  "The plain intent of Congress in enacting this statute was to halt and

7   reverse the trend towards species extinction, whatever the cost.  This is reflected not only in the

8   stated policies of the Act, but in literally every section of the statute." Tenn. Valley Auth. v. Hill, 437

9   U.S. 153, 184 (1978).  To that end, holding state officials responsible for authorizing take is

10  consistent with ESA policy goals.

11              **E.      The Court has jurisdiction here.**

12          In conclusion, whether state officials are violating the ESA take prohibition is a question that

13  cannot be answered until the Court has undertaken a fact-intensive inquiry.  But Plaintiffs have made

14  a sufficient showing that state officials are "alleged to be in violation" of the Act such that the Court

15  has jurisdiction over this citizen suit. See 16 U.S.C. § 1540(g).

16  **VI.    Tenth Amendment**

17          Defendants argue that the Tenth Amendment prohibits the Court from ordering State

18  Defendants to bring their regulatory program into compliance with the ESA.  They argue that

19  because the Tenth Amendment prohibits the Court from imposing the requested relief, Audubon does

20  not have standing because its injuries are not redressable.

21              **A.      Background on Tenth Amendment Jurisprudence**

22          As the Supreme Court has explained, "Congress may not simply 'commandeer the legislative

23  process of the states by directly compelling them to enact and enforce a federal regulatory program.'"

24  New York v. United States, 505 U.S. 144, 161 (1992) (quoting Hodel v. Va. Surface Mining &

25  Reclamation Assn., Inc., 452 U.S. 264, 288 (1981)).  But Congress can urge a state to regulate in a

26  particular way by offering the state incentives to do so. Id. at 166.  Or, where Congress has the

1  authority to regulate private activity under the Commerce Clause, Congress may offer states "the

2  choice of regulating the activity according to federal standards or having state law pre-empted by

3  federal regulation." Id. at 167.  In New York, the Supreme Court concluded that the "take title"

4  provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985 — which required

5  states either to enact legislation providing for the disposal of radioactive waste generated within their

6  borders, or to take title to, and possession of the waste — violated the Tenth Amendment.  Id. at

7  174-76.  In a subsequent case, Printz v. United States, the Supreme Court held that a provision of the

8  Brady Act that imposed on chief law enforcement officers the mandatory obligation to perform

9  background checks on prospective handgun purchases ran afoul of the rule that the federal

10 government may not compel states to enact or administer a federal regulatory program. 521 U.S.

11 898, 933, 935 (1997).  The Printz Court emphasized that Congress could not avoid the prohibition

12 described in New York by directly conscripting state officers. Id. at 935.

**B.      The Tenth Amendment Does Not Bar Injunctive Relief Here**

14      Defendants argue that the Tenth Amendment bars Plaintiffs' requested injunctive relief.  In

15 their complaint, Plaintiffs request that the Court "[e]njoin Defendants Sutherland, Christiansen, [the

16 Department], and their employees and agents from approving forest practices that destroy suitable

17 Spotted Owl habitat in owl circles outside of [emphasis areas] until the State provides reasonable

18 assurances that State-authorized forest practices will not take Spotted Owls in violation of the ESA."

19 (Compl. at 29.)  Defendants argue that such an injunction would force the State to include approval

20 conditions in its permitting scheme that meet federal regulatory standards.  Plaintiffs argue that any

21 injunction would only force state officials to comply with applicable, and pre-empting, federal law.

22      Plaintiffs' position is supported by case law.  In Coxe, the First Circuit directly addressed the

23 potential Tenth Amendment problem, and concluded that New York and Printz did not bar injunctive

24 relief.  In that case, the court approved the district court injunction that ordered the parties to form a

25 working group and engage in substantive discussions toward rectifying Massachusetts' ESA

26 violation. Coxe, 127 F.3d at 168.  In reaching that conclusion, the court noted that a state scheme

whose operation is inconsistent with the intent of the ESA cannot continue.  Id. (citing Palila v. Haw. Dept. of Land & Nat. Res., 852 F.2d 1106, 1110 (9th Cir. 1988) and Palila v. Haw. Dep't of Land & Nat. Res., 639 F.2d 495, 497-98 (9th Cir. 1981)).  The court also concluded that the district court properly tailored its injunctive relief to avoid any Tenth Amendment problem.  Id.  The injunction did not ban gillnet and lobster pot fishing, did not order specific modifications, and did not command the state to restrict its permitting process.  Id. at 168.  Because defendants were not ordered to take "positive steps with respect to advancing the goals of a federal regulatory scheme" and instead were only "directed ... to find a means of bringing the Commonwealth's scheme into compliance with federal law," the district court's injunction did not run afoul of New York, Printz, or the Tenth Amendment.  Id. at 170; see also Brown, 2002 WL 32356431, at *10 (considering Tenth Amendment at motion to dismiss stage and concluding that it did not impose a barrier because "ordering a state official to stop violating federal law does not offend the Tenth Amendment").

The Tenth Amendment does not bar a federal court from ordering state officials to comply with federal law. New York, 505 U.S. at 179.  If the Court finds for Plaintiffs on the merits, it can craft an injunction that orders state officials to stop violating the ESA, but avoids ordering the state to take "positive steps with respect to advancing the goals of a federal regulatory scheme." See Strahan, 127 F.3d at 170.  Thus, the Tenth Amendment does not bar Plaintiffs' action, nor does it undermine Plaintiffs' standing.

## VII.  _Burford_ Abstention

Finally, Defendants argue that the Court should decline to consider Audubon's claims under the Burford abstention doctrine. See Burford v. Sun Oil Co., 319 U.S. 315 (1943).  Burford allows courts to "decline to rule on an essentially local issue arising out of a complicated state regulatory scheme." United States v. Morros, 268 F.3d 695, 705 (9th Cir. 2001) (internal quotation marks omitted).  "The power to dismiss recognized in Burford represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it."

1   Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 727 (1996).  The Ninth Circuit has developed a

2   three-part test for assessing whether Burford abstention applies.  Burford's application requires:

3          first, that the state has chosen to concentrate suits challenging the actions of the agency
           involved in a particular court; second, that federal issues could not be separated easily
4          from complex state law issues with respect to which state courts might have special
           competence; and third, that federal review might disrupt state efforts to establish a
5          coherent policy.

6   Morros, 268 F.3d at 705 (quoting Knudsen Corp. v. Nev. State Dairy Comm'n, 676 F.2d 374, 377

7   (9th Cir. 1982)).

8          The first two factors are not met here.  First, although Washington has concentrated suits

9   challenging actions of the Department in the Forest Practices Appeals Board, as explained above, the

10  Appeals Board lacks jurisdiction to hear ESA claims.  See Repar, 2005 WL 2845720, at *8.  Because

11  "timely and adequate state-court review" is not available, the Court should not abstain.  See New

12  Orleans Pub. Serv., Inc. v. Council New Orleans ("NOPSI"), 491 U.S. 350, 361 (1989).  And

13  although state courts have jurisdiction to review forest practice regulations and their impacts on

14  spotted owls, they have no specialized competence in federal ESA law or endangered species

15  regulation.  Second, this case does not turn on complex state law issues, but presents questions of

16  federal statutory and constitutional law.  It is also a preemption case, "which is plainly not an issue

17  with respect to which state courts might have special competence."  Morros, 268 F.3d at 705 (internal

18  quotation marks omitted).  As the Ninth Circuit explained in Morros, "Burford abstention is

19  particularly inappropriate when the plaintiff's claim is based on preemption, because abstaining under

20  Burford would be an implicit ruling on the merits."  Id.

21         Regarding whether federal review might disrupt state efforts to establish a coherent policy,

22  Defendants argue that Plaintiffs' case will disrupt the Board's efforts to develop a sound spotted owl

23  policy and the development of a federal owl recovery plan.  But State Defendants' participation in

24  owl protection and recovery efforts does not turn spotted owl take into an "essentially local issue

25  arising out of a complicated state regulatory scheme."  See id.  Because northern spotted owls are

26  listed under the ESA, their protection and preservation is a matter of national concern.  Even though

1    this lawsuit may affect ongoing spotted owl recovery efforts, that outcome is not sufficient grounds

2    for abstention.

3           Defendants rely almost entirely on the Fifth Circuit's decision in Sierra Club v. City of San

4    Antonio, 112 F.3d 789 (5th Cir. 1997).  In that case, the Fifth Circuit held that Burford precluded

5    issuance of a preliminary injunction in an ESA take case where the injunction would have wrested

6    control of an intrastate aquifer from a state agency charged with developing a comprehensive water

7    management plan.  Sierra Club, 112 F.3d at 794-96.  Sierra Club is distinguishable on a number of

8    grounds.  First, the Sierra Club court noted that "both the aquifer and the endangered species are

9    entirely intrastate, which makes management of the aquifer a matter of particular importance to the

10   state." Id.  In contrast, the northern spotted owl ranges along the Pacific coast region from southern

11   British Columbia to Marin County, California. (Compl. ¶ 25; State Def.'s Answer ¶ 25.)  Second, in

12   Sierra Club, state law required the agency to consider application of the ESA and protect listed

13   species when developing a comprehensive plan to manage the aquifer. Sierra Club, 112 F.3d at 794.

14   Here, the State disclaims any legal duty to ensure that forest practice applications approved are

15   consistent with ESA take standards.  See WAC 222-50-020(5).  Finally, the Fifth Circuit decision

16   appears to be in conflict with Supreme Court case law, which requires that "timely and adequate

17   state-court review" be available. Compare Sierra Club, 112 F.3d at 797 (disregarding adequate

18   review requirement), with NOPSI, 491 U.S. at 361 (imposing adequate and timely state-court review

19   requirement).  Sierra Club is therefore distinguishable and not persuasive here.

20                                            **Conclusion**

21           Audubon has sued State Defendants and Weyerhaeuser Company for "taking" spotted owls in

22   violation of the Endangered Species Act.  In two summary judgment motions, Defendants and

23   Intervenors raise a number of preliminary issues.  The Court concludes as follows: First, Plaintiffs'

24   claims against the Board and Department are dismissed because they are barred by the Eleventh

25   Amendment.  Likewise, Plaintiffs' claims against the individual Board members are dismissed because

26   those individuals are absolutely immune from liability arising from their quasi-legislative acts.

ORDER - 22

Second, because Plaintiffs' alleged injury — take of spotted owls — is fairly traceable to State Defendants' actions and because a favorable decision in this Court would redress Plaintiffs' injury, Plaintiffs have standing to pursue their claims against the remaining State Defendants.  Third, Plaintiffs' claims are ripe because further factual development is unnecessary, judicial review will not interfere with any administrative action, and delay will result in hardship.   Fourth, Plaintiffs have made a sufficient showing that state officials are alleged to be in violation of the ESA such that the Court has jurisdiction to consider Plaintiffs' citizens suit.  Fifth, the Tenth Amendment does not prohibit all possible relief because it does not bar the Court from ordering state officials to comply with federal law.  Finally, <u>Burford</u> abstention is not appropriate here where Plaintiffs' claims are based in part on preemption and raise issues of federal statutory and constitutional law.

For these reasons, the Court GRANTS IN PART and DENIES IN PART State Defendants and Intervenors' motions for summary judgment.

The clerk is directed to send copies of this order to all counsel of record.  The case caption shall be modified to reflect the fact that Defendants Sutherland, Christensen, and Weyerhauser Company are the only remaining defendants in this action.

Dated this 2nd day of May, 2007.

Marsha J. Pechman
United States District Judge